J-S43001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M.R, A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M., FATHER | : | No. 21 MDA 2016 |

Appeal from the Dispositional Order December 11, 1015
In the Court of Common Pleas of Lancaster County
Juvenile Division at No(s): CP-36-DP-0000258-2015

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED JUNE 27, 2016**

Appellant, C.M. ("Father"), appeals from the order entered in the Lancaster County Court of Common Pleas, which adjudicated his minor daughter, R.M.R. ("Child"), dependent, approved a child permanency plan with the primary goal set as adoption, and suspended Father's visitation with Child.  We affirm.

The juvenile court's opinion sets forth the relevant facts and procedural history of this case as follows:

> On November 20, 2015, the Lancaster County Children and Youth Social Services Agency ("[CYS]") received reports that Mother had given birth to her third child, R.M.[R]. [On November 23, 2015, CYS filed a petition for dependency and motion for the finding of aggravated circumstances.]  Both Mother and Father have history with children services agencies.  As of December 8, 2015, Father had fathered at least twelve children, only one of [whom] was in his care.  Father previously had his parental rights involuntarily terminated as to another child in Lancaster County.  At the time of the hearing, Mother had given birth to three children, none of whom were in

her legal or physical custody. Mother also previously had her parental rights involuntarily terminated as to another child in Montgomery County, Pennsylvania. Neither Mother nor Father had completed a child permanency plan for reunification, despite having been afford[ed] plans and provided services. Based on the family's history, [CYS] took emergency custody of the newborn and placed her in [a CYS] approved resource home. [CYS] filed a Petition for Dependency and a Motion for Finding of Aggravated Circumstances based on Mother's…prior involuntary termination of [her] parental rights [to another child].

The Shelter Care hearing was held on November 24, 2015. Both parents were present and indicated through their respective attorneys that they wished to waive the shelter care hearing without admitting any of the allegations set forth in the petition for dependency and without prejudice. The [c]ourt granted temporary legal and physical custody of the Child to [CYS]. Given the age of the [C]hild, the [c]ourt granted parents supervised, one-hour weekly visits at [CYS] pending the Adjudication/Disposition hearing.

The Adjudication/Disposition hearing was held on December 8, 2015. [CYS] presented the testimony of the caseworker…. Father was present, represented by counsel, and testified on his own behalf. Mother was also present, represented by counsel, and testified on her own behalf. The [c]ourt found [CYS] presented clear and convincing evidence establishing that the parental rights of the parent have been involuntarily terminated with respect to another child of the parent, proven as to Mother and Father, and found that aggravated circumstances existed as to both Mother and Father. An Aggravated Circumstances Order was issued on December 8, 2015. The [c]ourt also found that the [C]hild was without the proper care or control necessary for her physical, mental, and emotional health, or morals and adjudicated her dependent. The [c]ourt issued an Order of Adjudication and Disposition on December 8, 2015, which approved a child permanency plan with no goals from reunification with parents and the primary placement goal set as adoption. Parents are appealing that Order.

(Juvenile Court Opinion, filed February 1, 2016, at 1-3) (citations to record

- 2 -

and footnotes omitted). On January 5, 2016, Father filed a timely notice of appeal and a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i).

Father raises the following issues on appeal:

> DID THE TRIAL COURT ABUSE ITS DISCRETION BY FINDING THE AGENCY MET ITS BURDEN TO FIND CHILD DEPENDENT WHEN FATHER TESTIFIED CONCERNING HIS STEADY INCOME, STEADY HOUSING, AND TREATMENT PROGRAMS HE COMPLETED IN THE PAST THAT ADDRESSED THE AGENCY'S CURRENT CONCERNS?
>
> DID THE TRIAL COURT ABUSE ITS DISCRETION BY APPROVING A CHILD PERMANENCY PLAN THAT FAILS TO PROVIDE ANY GOALS FOR REUNIFICATION WITH FATHER WHEN FATHER TESTIFIED CONCERNING HIS STEADY INCOME, STEADY HOUSING, AND TREATMENT PROGRAMS HE COMPLETED IN THE PAST THAT ADDRESSED THE AGENCY'S CURRENT CONCERNS?
>
> DID THE TRIAL COURT ABUSE ITS DISCRETION BY FINDING IT WAS NOT IN CHILD'S BEST INTEREST TO CONTINUE VISITATION BETWEEN FATHER AND CHILD WHEN FATHER TESTIFIED CONCERNING HIS STEADY INCOME, STEADY HOUSING, AND TREATMENT PROGRAMS HE COMPLETED IN THE PAST THAT ADDRESSED THE AGENCY'S CURRENT CONCERNS?

(Father's brief at 7).

For purposes of disposition, we combine Father's issues. Father argues CYS failed to prove by clear and convincing evidence that Child was dependent because Father has completed all CYS programs, has maintained gainful employment, has a home large enough to accommodate Child, and cared for Child in the hospital after her birth without concern raised by CYS. Father also claims Child should not have been found dependent based on

Father's prior involuntary termination of parental rights for another child because the termination occurred outside of the three-year statutory period within which a subsequent child must be adjudicated dependent. Alternatively, Father avers that if Child is dependent, CYS failed to prove it was clearly necessary to remove Child from Father's custody because he had not been offered any services since 2011, and is willing to complete any treatment or goals necessary to reunite with Child. Father insists his actions warrant a child permanency plan with a primary goal of reunification because CYS failed to provide adequate services to Father, hospital staff did not raise concerns about Father's care of Child, and Father has a steady income and appropriate housing for her. Father asserts that if a child permanency plan has a goal of reunification, the grave threat standard must be applied in the court's denial of visitation with Child. In this case, Father maintains CYS did not meet the standard because it failed to prove he had ongoing mental health issues that posed such a threat to Child. Conversely, Father maintains that if a child permanency plan with the goal of adoption is appropriate, his continued visitation with Child is in her best interest because Father has an emotional relationship with Child based on his willingness to reunite with her and because CYS failed to prove otherwise.

Our standard and scope of review from an adjudication of dependency is as follows:

> The standard of review which this Court employs in cases
> of dependency is broad. However, the scope of review is

limited in a fundamental manner by our inability to nullify the fact-finding of the [trial] court. We accord great weight to this function of the hearing [court] because [it] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [it]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re E.B.*, 898 A.2d 1108, 1112 (Pa.Super. 2006) (quoting *In re D.A.*, 801 A.2d 614, 617-18 (Pa.Super. 2002) (*en banc*)). The Juvenile Act defines a dependent child, in pertinent part, as follows:

**§ 6302. Definitions**

\* \* \*

**"Dependent child."** A child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [her] physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

\* \* \*

(10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. § 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child.

42 Pa.C.S.A. § 6302(1), (10). A court may adjudicate a child as dependent

if the child meets the statutory definition by clear and convincing evidence. *E.B., supra*. Additionally, "[a] finding of dependency can be made based on prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re R.W.J.*, 826 A.2d 10, 14 (Pa.Super. 2003). "The court must make a comprehensive inquiry into whether proper parental care is immediately available or what type of care [father] could provide in the future." *Id.*

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state.

*E.B., supra* at 1112.

Upon a finding of dependency, the court must focus on the child's best interests and order a disposition best suited to the child's safety and well-being. *In re S.B.*, 943 A.2d 973 (Pa.Super. 2008); *In re L.C., II*, 900 A.2d 378, 381 (Pa.Super. 2006) (citing 42 Pa.C.S.A. §§ 6341(a), 6341(c), 6351(a)); 42 Pa.C.S.A. § 6351(g)). The court may not separate the child from her parent unless it finds that the separation is clearly necessary. *In re G.T.*, 845 A.2d 870 (Pa.Super. 2004). Such necessity is implicated where the child's welfare, safety, or health demands she be taken from her parent's custody. *Id.*; *In re R.W.J., supra*; 42 Pa.C.S.A. §§ 6301(b), 6351(b).

Aggravated circumstances may be alleged during dependency

- 6 -

proceedings where "[t]he parental rights of the parent have been involuntarily terminated with respect to a child of the parent." 42 Pa.C.S.A. § 6302.

> If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether…reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a [permanency] hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1). **See also** 42 Pa.C.S.A. § 6351(e)(2). The existence of aggravated circumstances militates against returning the dependent child to her parents. **In re A.H.**, 763 A.2d 873, 878 (Pa.Super. 2000).

Section 6351(f) provides in relevant part as follows:

**§ 6351. Disposition of dependent child**

\*   \*   \*

> **(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

\*   \*   \*

> (9) if the child has been in placement for at least 15 of the last 22 months **or** the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the home or to preserve and reunify the family need not

be made or continue to be made, determine whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child….

\* \* \*

42 Pa.C.S.A. § 6351(f)(9).

Additionally, in reviewing an order suspending visitation, our standard of review is as follows:

> The polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children. Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined according to a child's best interests. Thus, it has been said that the sole concerns of a court called upon to enforce a parent's right of visitation are the welfare and best interests of the child.

> However, because of the constitutionally protected liberty interest parents have to such visitation, parental visitation is usually not denied or limited unless visitation with the parent poses a grave threat to the child. In fact:

> > It has long been the law in this Commonwealth that only when the evidence clearly shows that [parents] are unfit to associate with [their] children should [they] be denied the right to see them. …

> In dependency cases such as this, the standard against which visitation is measured also depends upon the goal mandated in the family service plan. Where, as here, reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If, however, the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children. The "best interests" standard, in this context, is less protective of parents' visitation rights than the "grave threat" standard.

- 8 -

*In re C.J.*, 729 A.2d 89, 94-96 (Pa.Super. 1999) (internal citations and footnote omitted). "[S]o as not to usurp the role of the lower court as factfinder, we will affirm only if the evidence is such that no two reasonable people could disagree that the grave threat standard has been met." *In re B.G.*, 774 A.2d 757, 762 n.5 (Pa.Super. 2001).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Jay J. Hoberg, we conclude Father's issues merit no relief. The juvenile court's opinion comprehensively discusses and properly disposes of the questions presented. (*See* Juvenile Court Opinion at 3-12) (finding: **(1)** Father was treated for depression in 1980's but has not participated in treatment since 1989; Father took some parenting and domestic violence classes in late 1990's and completed alcohol treatment program in 2001 but testified that he still drinks alcohol occasionally; Father recently was unemployed for period of six years due to his ex-wife's illness, his caring for her, and her death; Father was involved in domestic violence incident shortly after taking most recent domestic violence course in 2004; Father has not had stable living situation, as he has moved on numerous occasions and currently lives with Mother and his son/brother from Father's incestuous relationship with his own mother; Father's testimony regarding his participation in treatment was not credible; moreover, regardless of whether Father completed treatment, he did not address CYS' concerns regarding inappropriate

- 9 -

caretakers and lack of appropriate supervision for his children, as well as Father's mental health and substance abuse; Father has history of allowing inappropriate individuals to supervise his children or otherwise have access to them, including individual who sexually abused one of Father's children; neither parent has made visible progress toward alleviating concerns which necessitated removal of other children from their care; court cannot return Child to Mother and Father without jeopardizing Child's safety due to family history of sexual abuse and inappropriate relationships, untreated mental health of both parents, statutory finding of aggravated circumstances against both parents, lack of response to remedial efforts taken by CYS, and current lack of realistic remedial services; CYS presented clear and convincing evidence that neither parent is able to parent Child; thus, Child is dependent; **(2)** CYS caseworker testified credibly; testimony of Father was not persuasive and was vague in specifics of past treatment; majority of Father's treatment was too far in past to address current concerns of CYS; Father has not completed plan for reunification with any of his children; out of Father's twelve children, only two were ever in his care, and CYS was involved with both; since Father's last participation in mental health treatment, he has twice been indicated as perpetrator of sexual abuse by omission, has had his parental rights involuntarily terminated to another child, has had incestuous relationship with his own mother resulting in birth of four children, moved to new residence on numerous occasions, went

through six-year period of unemployment, and continued to use alcohol despite history of alcohol abuse; Father refused to accept responsibility for sexual abuse of his child and admitted he remained in contact with at least one indicator of abuse; given family history, sexual abuse of Father's other child, and lack of remedial actions taken by Mother or Father regarding abuse and mental health issues, it was not in Child's best interest to be reunified with Mother or Father; thus, child permanency plan with primary goal set as adoption was approved; **(3)** record is clear Mother and Father have extensive mental health and parenting issues, which justified goal of adoption based on concern for safety of Child if placed in custody of either parent; to that end, court suspended all visitation; Father's denial of need for mental health services does not bode well for Child's safety; decision to suspend visitation was appropriate).[1]  Accordingly, we affirm on the basis of the juvenile court's opinion.

Order affirmed.

---

[1] With respect to Father's claim of a limited statutory look-back period of three years, we observe Father's reliance on the specific definition of dependency is inapposite.  Although his claim implicates the definition of dependency, found in 42 Pa.C.S.A. § 6302, the specific subsection on which he relies does not apply to this case.  The juvenile court was not precluded from finding dependency pursuant to 42 Pa.C.S.A. § 6302(1) (defining "Dependent Child" to include determination that conduct of parent "places the health, safety or welfare of the child at risk").  Accordingly, under subsection (1), the juvenile court's finding was not limited to a statutory look-back period and the finding of dependency was appropriate.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/27/2016</u>

THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE COURT DIVISION

IN RE:

R.M.R.

No. CP-36-DP-0000258-2015

**OPINION SUR APPEAL**

On December 8, 2015, the Court issued an Order of Adjudication and Disposition adjudicating R.M.R. (Child) as a dependent child, approved a child permanency plan (CPP) with the primary goal set as adoption, and suspended visitation for birth mother, E.R. (Mother) ) and birth father, C.M. (Father) ). The Court also issued an Aggravated Circumstances Order finding that aggravated circumstances exist as to both parents.

On January 5, 2016, Father filed Notice of Appeal of the December 8, 2015, Order of Adjudication and Disposition. That same day, Mother also filed Notice of Appeal of the December 8, 2015, Order of Adjudication and Disposition. Parents assert the same three issues in their respective 1925(b) statements. First, Parents argue the Court erred in finding Child to be a dependent child. Second, Parents argue the Court erred in approving a Child Permanency Plan without goals for reunification for parents. Third, Parents argue the Court erred in suspending all visitation between the Child and Parents. Neither Mother nor Father are appealing the finding of aggravated circumstances against them.

On November 20, 2015, the Lancaster County Children and Youth Social Services Agency (hereinafter "the Agency") received reports that Mother had given birth to her third child, R.M.R. Both Mother and Father have history with children services agencies. As of

1

December 8, 2015, Father had fathered at least twelve children, only one of which was in his care.[1] Father previously had his parental rights involuntarily terminated as to another child in Lancaster County. *See* Petitioner's Exhibit No. 2, 12/8/15. At the time of the hearing, Mother had given birth to three children, none of whom were in her legal or physical custody. Mother also previously had her parental rights involuntarily terminated as to another child in Montgomery County, Pennsylvania. *See* Petitioner's Exhibit No. 1, 12/8/15. Neither Mother nor Father had completed a child permanency plan for reunification, despite having been afford plans and provided services. Based on the family's history, the Agency took emergency custody of the newborn and placed her in an Agency approved resource home. N.T. 12/8/15, 3. The Agency filed a Petition for Dependency and a Motion for Finding of Aggravated Circumstances based on Mother's and Father's prior involuntary termination of their parental rights.

The Shelter Care hearing was held on November 24, 2015. Both parents were present and indicated through their respective attorneys that they wished to waive the shelter care hearing without admitting any of the allegations set forth in the petition for dependency and without prejudice. The Court granted temporary legal and physical custody of the Child to the Agency. Given the age of the child, the Court granted parents supervised, one-hour weekly visits at the Agency pending the Adjudication/Disposition hearing.

The Adjudication/Disposition hearing was held on December 8, 2015. The Agency presented the testimony of the caseworker, Alexis Palmer. Father was present, represented by

---

[1] Father's first four children were through an incestuous relationship with his mother,       . Three of the four children died in infancy. The surviving child, S . , was in and out of the Agency care until his 18th birthday, when he aged out and returned to Father's home N.T. 12/8/15 at 11-12. The caseworker testified that Father did not have names, locations, or birth dates for children five through eight. Id. at 10. Father's ninth child, G. was in the custody of her mother. Father reported to have occasional contact with G. but has never actually seen her face-to-face, paid child support, or parent G  s. Id. at 10. Father's eleventh child, A. , was periodically in Father's care. The Agency was providing services toward reunification until Father was indicated as a perpetrator of sexual abuse by omission as to A . . Father was not given a plan for reunification and his parental rights were involuntarily terminated on May 27, 2011. *See* Petitioner's Exhibit No. 3, 12/8/15.

counsel, and testified on his own behalf. Mother was also present, represented by counsel, and testified on her own behalf. The Court found the Agency presented clear and convincing evidence establishing that the parental rights of the parent have been involuntarily terminated with respect to another child of the parent, proven as to Mother and Father, and found that aggravated circumstances existed as to both Mother and Father. *See* Petitioner's Exhibit No. 1 & 3. An Aggravated Circumstances Order was issued on December 8, 2015. The Court also found that the child was without the proper care or control necessary for her physical, mental, and emotional health, or morals and adjudicated her dependent. The Court issued an Order of Adjudication and Disposition on December 8, 2015, which approved a child permanency plan with no goals from reunification with parents and the primary placement goal set as adoption. Parents are appealing that Order.

Both Father and Mother argue the Court erred in finding the Child dependent. Father argues the Court erred in finding Child to be dependent when Father testified he had previously completed mental health treatment, drug and alcohol treatment, a parenting class, anger management treatment, domestic violence treatment, he had stable housing, and he had steady income to provide for Child's needs. The Court finds that the evidence presented on the record, including Father's own testimony, does not support Father's assertion.

Father testified he participated in mental health counseling and medicinal management from 1981-1989. Father stated he quit attending because he had his depression under control and no longer needed mental health counseling. N.T. 12/8/15 at 24. Father has not participated in any mental health treatment since 1989. Father testified that since his involvement with the Agency in his role as a parent, Father has not received any type of mental health treatment. Id. at 24-25. Father testified that he previously had an alcohol issue, but that he attended treatment for 12

3

weeks in 2001 and graduated from that program. He stated he will occasionally attend meetings, but often cannot due to his work schedule. Id. at 27. In response to the question of how long Father has remained sober, Father testified, "I haven't – I drink on special occasions, New Years, Christmas, I have one or two, which anybody does. But constantly being called a drunk, that's not me because if I was a drunk I would not keep a steady job. I would get lazy, not get up for work and not have nothing to show for in life." Id. at 28, lines 6-11.

Father testified that he works for A&A Waste "off and on", and stated he was "off" for a period of six years recently, due of his late wife's health and medical issues. He testified he started working again full-time after his wife died in November 2014. Father stated that he often works fourteen-hour days at least three days a week. Id. at 25.

Father testified that he participated in anger management and parenting in the late 1990s. Id. at 27. Father further testified he took a domestic violence class in the late 1990s and in 2004. Id. at 27, 29. It is uncontested that Father was involved in a domestic violence incident shortly after attending some domestic violence classes in 2004 and has not taken any domestic violence classes since. Id. at 29. Father testified he has, and has had, stable housing. Father admitted he has only been living at his current address since June 2015. Id. at 26. Before that, he lived with his aunt for two years. No evidence was present as to where Father resided before that. He currently lives with Mother and his son/brother, S.-, from his incestuous relationship with his Mother. Id.

Father did not offer any evidence aside from his testimony that he participated in treatment. The Court did not find his testimony to be credible or persuasive. Even if the Court accepted Father's assertion that he has successfully completed treatment in those areas, Father has still not addressed all the Agency's continued concerns. Concerns were for inappropriate

4

caretakers, lack of appropriate supervision, Father's mental health, drug use, parenting and the child's emotional wellbeing. Father has a history of allowing inappropriate individuals access to his children and lack of appropriate supervision of his children. The Agency continues to have concerns over Father's ability to protect his children due to the ongoing sexual abuse of the two children who were in his care. Father was twice indicated a perpetrator of abuse by omission for his daughter, A.. Father allowed an indicated perpetrator of sexual abuse to reside in his home. That individual was also indicated as a perpetrator of sexual abuse against A. Id. at 12. In response to questions about Father being indicated as a perpetrator by omission for not protecting his child, Father testified, "How can I work and protect her? That's what my wife was supposed to be there for." Id. at 31, lines 15-16.

Additionally, Father left A. in the care of S., who has significant delays in mental development and has been diagnosed with paranoid schizophrenia. Id. at 13. Father allowed his mother, who was also the mother of four of his children, to sleep in the same bed with S. and A. into their teenage years. It was reported that sometimes A [Father's mother] would be naked sleeping in the same bed with the children. There were also concerns that A [Father's mother] taught A. to masturbate, which A. was doing at school. Id. at 12. Father testified he still remains in contact with his mother, despite the abuse and prior PFAs. Id. at 30, 32.

Mother also argues the Court erred in finding the child to be dependent because Mother signed a Consent for Adoption for her second child after Mother realized she was not in a position to parent that child. Now, Mother argues, circumstances have changed, she has housing and stability, which put her in a position to parent this child. The Court also finds that the record does not support Mother's assertions.

5

During Mother's pregnancy with her first child, the Montgomery County Agency had concerns regarding Mother's lack of prenatal care, mental health and drug and alcohol issues. Mother asserted the lack of prenatal care for that child was the result of Mother's lack of knowledge of her pregnancy because she showed no symptoms. N.T. 12/8/15 at 38. Since Mother's termination of parental rights to her second daughter, Mother has attended a basic child care classes.[2] *See* Mother's Exhibit No. 1, 12/8/15. While Mother has rectified issues of prenatal care, Mother's second child was placed because the hospital reported concerns for the child's safety and Mother's threats to harm herself. Based on the evidence presented, these Family Nurturing classes did not address any of Mother's previous mental health issues including suicidal ideations during her past pregnancies. Therefore, while Mother may have rectified the Agency's concerns that her children were not receiving proper prenatal care, it does not rebut the Agency's evidence that Mother's current circumstances remain inappropriate for Child.

The Court believes because of the history of sexual abuse and inappropriate relationships, the untreated mental health of both parents, the statutory finding of aggravate circumstances against both Mother and Father, the lack of response to remedial efforts taken by the Agency, and the current lack of realistic remedial services, the Court cannot return this child to Mother and Father without jeopardizing her safety, protection, physical, mental and moral welfare.

It is clear, for both Mother and Father, that many of the Agency's valid and continuous concerns have still not been properly addressed. Despite their arguments otherwise, there is no visible progress made by either parent toward alleviating the Agency's initial concerns. This is

---

[2] Mother presented a certificate for Family Nurturing, and educational and support program for parents, which she attended from August 18, 2015, through November 3, 2015, and completed the necessary 20 hours of instruction. She also presented a letter from Cherilyn Reynolds CRNP from SouthEast Lancaster Health Services, Inc., attesting to Mother's treatment of care throughout her entire pregnancy. Finally, Mother presented a letter from Terri Hershey, a client advocate from A Woman's Concern attesting that Mother participated in five parenting education classes through A Woman's Concern, not only during her last pregnancy, but also her previous pregnancy. See collectively, Mother's Exhibit No. 1, 12/8/15.

6

not a situation where one parent is appropriate. The Agency presented clear and convincing evidence that neither parent is able to parent Child. The Court did not find the testimony of Mother and Father compelling. They have not appropriately addressed all of the Agency's prior concerns which necessitated removal of their other children from their care. Neither parent was satisfactorily able to show they could be trusted to ensure the safety of this child or were able to parent this child. The evidence is both clear and convincing that Child is dependent and that finding otherwise would place the health and safety of the child at risk.

Once Child has been adjudicated dependent, additional decisions in the context of permanency planning must be made according to her best interest. In re J.S.W., 651 A. 2d 167 (Pa. Super. 1994). Permanency planning is a concept whereby children are not relegated to the limbo of spending their childhood in foster homes, but instead, dedicated effort is made by the court and the children's agency to rehabilitate and unite the family in a reasonable time, and failing in this, to free the child for adoption. In re J.S.W., at 170. The Superior Court has held that providing no plan for reunification can be an appropriate decision, depending on the factual circumstances. In re R.T., C.A., K.A., 778 A.2d 670 (Pa. Super. 2001).

In reaching its dispositional decision, this Court found the Agency caseworker to be credible witness who provided independent, consistent, relevant, and persuasive testimony. The Court did not find the testimony of Father or Mother to be persuasive. Father was vague as to any specifics of his past treatment and offered no further evidence. Further, Mother provided no compelling reason why she is more committed to Child than she was her second child.

Parents argue that the Court erred in its approval of the CPP with the primary goal set as adoption. Father argues the Court erred in approving a Child Permanency Plan that fails to provide any goals for reunification with Father when Father previously completed treatment

7

programs to address the Agency's concerns and testified he was willing to complete these treatment program a second time to address the Agency's current concerns and provide him the necessary skills to parent Child . Father also asserts that he plans on maintaining his current housing and income.

The Court has fully address Father's claims of prior treatment in the previous section. As stated above, Father's argument that he previously completed all the necessary treatment programs is not supported by the record. Father testified that he participated in mental health treatment in the 1980s, attended a few parenting and domestic violence classes in the 1990s, and completed a 12 week alcohol treatment program in 2001. The Court found that the majority of Father's treatment was too far removed to support Father's assertion that his past treatment was sufficient to address the Agency's concerns. It is uncontested that Father has never completed a plan for reunification with any of his children. Moreover, out of Father's twelve children, only two were ever in his care, S. and A. The Agency was involved with both children.

Since Father's last participation in mental health treatment, he has been twice indicated as a perpetrator of sexual abuse by omission, has had his parental rights involuntarily terminated to another child, has experience the death of his wife, has moved on numerous occasions, has continued to use alcohol despite his history with alcohol abuse, had an incestuous relationship with his mother resulting in four children, and was unemployed for a period of at least six years. Father continually allowed inappropriate individuals into his home and gave them unsupervised access to his daughter.

Mother argues the Court erred in not approving a plan for reunification for Mother because a finding aggravated circumstances does not preclude Mother from being given a plan. Mother further argues that in the matter of her second child, which was also before this Court,

8

the Court found aggravated circumstances existed for Mother, but ordered a plan for reunification despite that finding. Mother erroneously believes that since the Court was willing to afford Mother the opportunity for reunification, it is thereafter compelled to provide Mother with a plan. The trail court has discretion in determining that reunification is not appropriate and is not in the child's best interest. *See* In Re R.J. T., 9 A.3d at 1190.

During Mother's prior involvement with the Agency and with this Court, aggravated circumstances were found to exist as to Mother based on Mother's previous involuntary termination of parental rights in Montgomery County. Even so, this Court approved a plan for reunification with objectives for Mother on March 2, 2014. Her goals included a mental health goal, a crime-free goal, a parenting goal, an income goal, a housing goal, and a commitment goal. Id. at 7. At the time of her second child's birth, Mother was homeless. Two months later, when the Court approved the plan for reunification, Mother was residing with Father. The Agency informed Mother that based on Father's previous involvement with the Agency, it would not be appropriate housing for her child. The caseworker testified that Mother indicated she had no intention of separating from Father at that time. Id. On March 31, 2014, Mother contacted the Agency and signed consents for adoption for her second child, voluntarily terminating her parental rights. Id. at 8. She has never parented any of her children and has never completed a plan for reunification. In fact, Mother has not made progress in any of the goal areas on her previous CPP.

Neither Mother[3] nor Father have addressed the mental health portions of their previous plans. Both parents were provided with help and services. Mother chose not to work on either of

---

[3] Mother admitted she had mental health goals on both plans but just never worked on the mental health portion of either of her plans. She testified that she was supposed to have an intake for mental health treatment the same day as the hearing, but that she couldn't get to it. Mother's attorney indicated Mother scheduled her

her plans. Mother remains unemployed. She has failed to remain crime free. She was arrested for retail theft and will be on probation until February 8, 2018. Id. at 4. Mother argues she has stable housing. She currently lives and maintains a relationship with Father, even after the Agency informed Mother in 2014 that Father's presence in the home made the home inappropriate for her second child to be returned to her.

Father sporadically participated in elements of his plans, but most of that occurred two to three decades ago. Father continues to insist that it was not his responsibility to protect his daughter from the sexual abuse she suffered in his home, because he had a job at the time. He admitted to maintaining contact with at least one indicated perpetrator of abuse against his child and has a history of allowing inappropriate individuals unsupervised access to his children. He does not believe he needs mental health services because he received treatment for depression nearly 27 years ago. Father offered no evidence that he completed any domestic violence program, anger management classes, parenting classes, or sexual abuse perpetrator by omission counseling. The Court did not find Father's testimony that he participated in these treatment programs "sometime in the late 1990s" to be particularly relevant or persuasive.

The Court cannot rely upon either Mother or Father to keep the child safe since both, at different times, have seriously threatened the well-being of their other children. This Court has grave concern regarding Father's failure to accept his responsibly in . A 's sexual abuse. None of Father's therapy has been recent nor did any of it deal with the abuse of his child. Mother was previously diagnosed with bipolar disorder, schizoaffective disorder, depressive disorder NOS, and mild mental retardation. Id. at 4. She testified that she does not have any of these conditions and has never had a mental health evaluation in her adult life, despite it being a component on

intake appointment at T.W. Ponessa in Lancaster for noon on December 8, 2015. The Court proceedings for the morning were scheduled from 8:30AM to 12:00PM. The hearing was concluded at 12:19PM.

her CPP for her first two children. Id. at 37. Mother was reported to have thoughts of suicide and threatened to harm herself. Mother also refused to heed the Agency's warnings that Father's presence in the home made her housing inappropriate for her child's return. Id. at 7.

Given the history of this family, the sexual abuse perpetrated against Father's other child, and the fact that there have been no serious remedial actions taken by the family relative to infliction of abuse or mental health treatment, the Court found that it was not in this Child's best interest to be reunified with parents and approved the CPP with the primary goal set as adoption. It is clearly not in Child's best interest to once again provide parents with access to the same services they previously failed to accept and complete.

Having found Child to be a dependent child, the Court must issue a disposition in the best interest of the child. Child's best interest requires that she live permanently in a loving home where there exists no risk of abuse or harm from her birth parents. Ms. Palmer, the Agency caseworker, testified that Child is doing well in current resource home, which includes her half-sister, I. . I. , Mother's second child, was adopted by the resource family on May 14, 2015. *Id.* at 15; *See* Petitioner's Exhibit No. 2, 12/8/15. The child is in a suitable resource home where she is doing well, is happy, and is safe from the abuse and threat of abuse Mother and Father posed. Her home is a potential permanent resource for Child. The Court finds this placement appropriate. It is a safe, family-setting where all her needs are being met.

Given the Father's long history with the Agency, Mother's decision to continue residing with Father, and neither parents' progress on addressing the Agency's continuing concerns, Father and Mother cannot be trusted to provide a safe haven for this child within a reasonable amount of time. Based on the record and for the reasons set out above, the Court finds that the

current disposition of no plan for reunification with parents and a primary goal for adoption is best suited to the safety, protection, and physical, mental and moral welfare of *Child*.

Father's final 1925(b) issue argues the Court erred in suspending all visitation with Father when the Agency failed to prove that Father posed a grave threat to *Child* or that visitation between Father and the Child is not in the best interest of the Child. Father again argues he previously completed treatment programs that addressed that Agency's current concerns with Father and the Agency failed to provide any evidence of concerns pertaining to Father' care of Child while in the hospital after Child was born. Mother argues the Court erred when it did not provide any visitation for Mother, but did not make a formal finding that Mother posed a grave risk to the child.

Having determined that *Child*'s primary goal should be adoption, the Court suspended visitation for both Mother and Father in furtherance and preparation of the child for adoption. While the Court did not make any formal finding that Mother and Father posed a grave risk to the child, the record is quite clear that they have extensive mental health and parenting issues that justify the Court's concern for the future safety of *Child* if she were placed in to the custody of either parent, and supports the Court's decision to establish the goal as adoption, and to that end suspend all visitation. Neither Mother nor Father believe they need mental health services. This is a problem and points out the gravity of the situation. Whether parents' denial is purposeful or unconscious, it does not bode well for the safety of *Child* in their care. The decision to suspend visits was appropriate and was the only decision this Court could make given the totality of the record and in furtherance of the Child's primary goal of adoption.

Based upon the totality of the record, and for the reasons sets forth in this Opinion, the

Court's Order of Adjudication and Disposition dated December 8, 2015, should be affirmed.

The Clerk of Courts is directed to transmit the record to the Superior Court.

BY THE COURT:

I certify this document to be filed in Dated Lancaster County Office of the Clerk of the Courts.

JAY J. HOBERG, JUDGE

Jacquelyn E. Pfursich
Clerk of Courts

Copies to:
Catharine I. Roland, Esquire – Attorney for Appellant Mother
Jeremy Montgomery, Esquire – Attorney for Appellant Father
John E. Churchville, Esquire – Attorney for Agency
Pamela J. Breneman, Esquire – Guardian ad Litem
Children and Youth (2)

13